IN THE DISTRICT COURT OF JOHNSON COUNTY, KANSAS
CIVIL COURT DEPARTMENT

MAXUS PROPERTIES, INC.,

MLAKE11, LLC,

CENTENNIAL PARK APARTMENTS TIC 20,
LLC,

   *and*

CENTENNIAL PARK KANSAS, LLC,

      *Plaintiffs,*

  *vs.*

AMERICAN SPECTRUM REALTY
MANAGEMENT, LLC,

AMERICAN SPECTRUM REALTY
MANAGEMENT II, LLC,

AMERICAN SPECTRUM ASSET CO., LLC,

MATTHEW V. THORNTON,

   *and*

CENTENNIAL PARK INVESTORS, LLC,

      *Defendants.*

'11 C V 0 5 4 6 6

Case No:

Division: 3

Chapter 60

---

## PETITION

Plaintiffs, for their claims against defendants, state as follows:

### SUMMARY OF THE CASE

Prior to May 11, 2011, Centennial Park Apartments, located near the intersection of 119th St.
and Antioch (the "Property"), was owned by several Tenants in Common, and the Property was
managed by defendant American Spectrum Realty Management, LLC ("ASR") until April 15, 2011.
The Tenants in Common elected to terminate ASR, contributed their tenancy in common interests

**carter llp**
A T T O R N E Y S

SCAN DATE 2011/06/24  15:25

into a limited liability company (Centennial Park Kansas, LLC ("LLC")), and replaced ASR with a different property manager, Maxus Properties, Inc. ("Maxus"). Prior to the closing on these transactions in April 2011, there had been weather-related property damage to the Property's roof. *After* ASR's property management contract was terminated and *after* the tenancy in common interests were all contributed to the LLC, ASR settled the insurance claim for that damage, kept approximately $98,000 of the insurance proceeds for itself (despite having no right to do so), and distributed the balance of the insurance proceeds *not* to the LLC, but rather to the former Tenants in Common, thereby leaving the Property without adequate funds to make the necessary repairs and subject to the risk of violating its loan covenants with its lender.

## PARTIES, JURISDICTION, AND VENUE

1.      Centennial Park Kansas, LLC, is a Kansas limited liability company owning the Property.

2.      MLAKE11, LLC, is a Missouri limited liability company serving as the Managing Member of Centennial Park Kansas, LLC.

3.      Centennial Park Apartments TIC 20, LLC, is a Delaware limited liability company.

4.      Defendant American Spectrum Realty Management, LLC, is a Delaware limited liability company that can be served through its registered agent, National Registered Agents at 2101 SW 21st St., Topeka, KS 66604.

5.      Defendant Centennial Park Investors, LLC, is a Delaware limited liability company that, upon information and belief, is owned and controlled by defendant ASR and can be served through its registered agent, Corporation Service Company, at 200 S.W. 30th St., Topeka, KS 66611.

6.      Defendant Matthew V. Thornton is the Vice President Risk Management of defendant American Spectrum Realty Management, LLC, who controlled defendants throughout the period of time relevant to this case and is, upon information and belief, a California resident who

SCAN DATE 2011/06/24 15:25

can be served at his place of employment, American Spectrum Realty Management, LLC, at 7700 Irvine Center Dr., Suite 780, Irvine, CA 92618.

7.      Defendant American Spectrum Realty Management II, LLC, is a Delaware limited liability company not admitted to do business in Kansas that can be served through its officer, defendant Matthew Thornton, at 7700 Irvine Center Dr., Suite 780, Irvine, CA 92618.

8.      Defendant American Spectrum Asset Co., LLC, is, upon information and belief, a Delaware limited liability company *not* admitted to do business in Kansas that can be served through its officer, defendant Matthew Thornton, at 7700 Irvine Center Dr., Suite 780, Irvine, CA 92618.

9.      Jurisdiction and venue are proper in Johnson County, Kansas.

## FACTS COMMON TO ALL COUNTS

### The Contribution Agreement

10.     As per § 1.2 of the April 1, 2011 Contribution Agreement (attached hereto as **Exhibit 1**), the Tenants in Common owning the Property contributed to the LLC their tenancy-in-common interests in exchange for membership interests in the LLC which, in turn, thereafter owned the Property.

11.     As per § 4.5 of the Contribution Agreement, *Damage or Condemnation*, the Tenants in Common were required to "... assign, transfer and set over to the Company any insurance proceeds that may thereafter be made for such damage or destruction" occurring prior to the Closing.

### The Transition Agreement

12.     The Tenants in Common terminated their property management agreement with ASR in effective on April 15, 2011, replaced ASR with Maxus, and entered into a Transition Agreement (attached hereto as **Exhibit 2**), with the stated purpose of "... provid[ing] for a smooth transition of asset and property management from [ASR] to the new asset and property manager selected by the Tenants in Common, Maxus Properties, Inc...."

SCAN DATE 2011/05/24 15:25

13.     ASR ceased being the property manager once Maxus obtained the New Loan, as per

§ 1.1, which reads as follows:

> **1.1**    The parties hereby agree to the termination of the Property Management
> Agreement effective concurrently with or immediately preceding the closing of a new mortgage loan in
> the amount of approximately $10,000,000 or more (the "New Loan"), to be obtained by Maxus and the
> Tenants in Common for the purpose of satisfying and repaying its current mortgage loan (the
> "Termination Date"). Until the Termination Date, Property Manager agrees to diligently carry out and
> perform its duties pursuant to the Property Management Agreement, including operating and managing
> the Property, and assisting the Owners and Maxus in providing the information required to obtain the
> New Loan.

*(Actual scanned image of § 1.1 of the Transition Agreement, Ex. 2)*

14.     Maxus took over management of the Property on April 15, 2011, and subsequently

obtained for the LLC the above-referenced "New Loan" on May 6, 2011, at which time ASR ceased

having any rights and powers as the property manager.

15.     On or before the date on which Maxus closed on the New Loan, ASR was required

to deliver to Maxus all reserves, unpaid bills, and contracts regarding the Property, as per § 1.5:

> **1.5**    On or before the Termination Date, Property Manager shall deliver to Maxus (a)
> any balance or monies of the Tenants in Common or other funds held by Property Manager with respect
> to the Property, including tenant security deposits and any reserves, and (b) all materials and supplies,
> keys, books and records, contracts, leases, receipts for deposit, unpaid bills and other papers or documents
> and electronic records that pertain to the Property.

*(Actual scanned image of § 1.5 of the Transition Agreement, Ex. 2)*

16.     One purpose of the Transition Agreement was to ensure that the Property continued

to be properly maintained.

17.     Following the Termination Date, ASR was to receive no other payments other than

monthly management fees earned prior to the Termination Date, as per § 2.1:

> **2.1**    On the Termination Date, Owner shall pay to Property Manager a fee of $76,875,
> as final payment of any management fee, financing fee, reimbursement or any other amounts due to
> Property Manager, Evergreen or any other person acting as "Property Manager" under the Property
> Management Agreement. No other payments will be made to Evergreen or Property Manager, with the
> exception of monthly management fees earned by Property Manager prior to the Termination Date.

*(Actual scanned image of § 2.1 of the Transition Agreement, Ex.2)*

SCAN DATE 2011/06/24  15:25

18.     In violation of § 2.1, after the Termination Date, ASR settled the Insurance Claim and withheld for itself approximately $98,000, which amounted to approximately 25% of the Insurance Proceeds.

19.     ASR lacked the authority to settle with the insurer regarding the Insurance Proceeds.

20.     ASR lacked any authority to retain for itself any percentage of the Insurance Proceeds, and there was no agreement allowing it to retain same.

21.     ASR lacked any authority to distribute portions of the Insurance Proceeds to the former Tenants in Common.

### The LLC Operating Agreement

22.     Pursuant to § 3.01(b) of the *Limited Liability Company Agreement of Centennial Park Kansas, LLC)* (the "LLC Operating Agreement", attached hereto as **Exhibit 3**), each Non-Managing Member was required to "assign, transfer, convey and contribute to the capital of the Company its entire undivided right, title, interest and benefit in and to the Project … including, without limitation, such Member's undivided interest in and to … all … *contracts* … and other agreements related to the Project…."

23.     Accordingly, each Non-Managing Member contributed its right to receive any portion of the Insurance Proceeds.

24.     The Insurance Claim was not "Ordinary Cash Flow" subject to distribution, as per §§ 10.24 and 10.49, but was instead the "proceeds of an Extraordinary Event":

10.24   Extraordinary Event

The term **"Extraordinary Event"** means the sale, disposition, exchange, financing, refinancing or other transfer, condemnation or acquisition by an entity with the power of eminent domain in lieu of formal condemnation proceedings, damage or destruction, of all or any portion of the Project (other than the incidental sales or exchanges of tangible personal property and fixtures).

* * *

SCAN DATE 2011/06/24 15:25

### 10.49  Ordinary Cash Flow

The term **"Ordinary Cash Flow"** means the amount, if any, of all cash receipts of the Company (exclusive of the proceeds of an Extraordinary Event; inclusive, however, of the proceeds from any rent or business interruption insurance) as of any applicable determination date in excess of the sum of (a) all cash disbursements (inclusive of any guaranteed payment within the meaning of Section 707(c) of the Code paid to any Member and the Asset Management Fee, but exclusive of disbursements made from the proceeds of an Extraordinary Event to the Members in their capacities as such) of the Company prior to that date; and (b) a reserve, established in the reasonable discretion of the Managing Member, for anticipated cash disbursements that will have to be made before additional cash receipts from third parties will provide the funds therefor.

*(Actual scanned image of §§ 10.24 and 10.49 of the LLC Operating Agreement, Ex.3, emphasis added.)*

25.     Under § 10.49, ASR was not the "Managing Member" capable of establishing a

reserve amount – Mlake11, LLC, was the Managing Member of the LLC.

26.     Pursuant to § 10.23, the Insurance Proceeds were "Extraordinary Cash Flow" which

were first to be used "for restoration and repair" of the Property:

### 10.23  Extraordinary Cash Flow

The term **"Extraordinary Cash Flow"** means the cash proceeds (including, without limitation, loan proceeds, insurance proceeds, recoveries, damages and awards; excluding, however, the proceeds of any rent or business interruption insurance) realized by the Company, directly or indirectly, as a result of the occurrence of an Extraordinary Event, plus cash interest payments received with respect to such proceeds, decreased by the sum of (a) the amount of such proceeds applied by the Company to pay debts and liabilities of the Company (inclusive of any guaranteed payment within the meaning of Section 707(c) of the Code paid to any Member); (b) the amount of such proceeds used, set aside or committed by the Company or required to be used by any secured lender for restoration and repair of any property of the Company in the event of damage or destruction to such property; (c) any incidental or ancillary expenses, costs or liabilities incurred by the Company in effecting or obtaining any such Extraordinary Event, or the proceeds thereof (including, without limitation, attorneys' fees, expert witness' fees, accountants' fees, court costs, recording fees, transfer taxes and fees, appraisal costs and the like) all of which expenses, costs and liabilities shall be paid from the gross amount of such cash proceeds to the extent thereof; and (d) a reserve, established in the reasonable discretion of the Managing Member, for anticipated cash disbursements that will have to be made before additional cash receipts from third parties will provide funds therefor.

*(Actual scanned image of § 10.23 of the LLC Operating Agreement, Ex. 3, emphasis added.)*

## COUNT I:  CONVERSION

27.    Plaintiffs hereby incorporate by reference the above allegations contained above as though fully set forth herein.

28.    Plaintiff LLC is the lawful owner of all property described in the foregoing paragraphs, including the Insurance Claim and the Insurance Proceeds.

29.    Defendants have unlawfully assumed and exercised rights of ownership over plaintiff's property to the exclusion of plaintiff.

30.    Plaintiff has been damaged thereby in an amount in excess of $75,000.

Wherefore, plaintiffs pray for judgment against defendants, jointly and severally, for damages in excess of $75,000, for costs, pre-judgment and post-judgment interest as provided by law, attorneys fees as per §§ 7.4 and 8.4 of the Transition Agreement, §§ 2.07 and 9.03 of the LLC Operating Agreement, and § 10.10 of the Contribution Agreement, and for all other relief as this Court shall deem just and proper.

## COUNT II:  BREACH OF FIDUCIARY DUTY

31.    Plaintiffs hereby incorporate by reference the above allegations contained above as though fully set forth herein.

32.    Defendants, in purporting to represent plaintiffs' interests vis-à-vis the insurer with regard to the Insurance Proceeds, were fiduciaries owing duties to plaintiffs.

33.    Defendants have engaged in inappropriate self-dealing by taking a portion of the Insurance Proceeds and by distributing a portion of the remaining Insurance Proceeds to themselves or to one of their affiliates.

34.    Defendants breached their fiduciary duties to plaintiffs by settling with the insurer for less than plaintiffs were owed, by dissipating the Insurance Proceeds, and by keeping a portion of the Insurance Proceeds.

SCAN DATE 2011/06/24  15:25

35.     Plaintiffs have been harmed by defendants' conduct in an amount in excess of $75,000.

Wherefore, plaintiffs pray for judgment against defendants, jointly and severally, for damages in excess of $75,000, for costs, pre-judgment and post-judgment interest as provided by law, attorneys fees as per § 8.4 of the Transition Agreement, §§ 2.07 and 9.03 of the LLC Operating Agreement, and § 10.10 of the Contribution Agreement, and for all other relief as this Court shall deem just and proper.

## COUNT III – INJUNCTIVE RELIEF: TEMPORARY RESTRAINING ORDER (K.S.A. 60-903), TEMPORARY INJUNCTION (K.S.A. 60-905), AND PERMANENT INJUNCTIVE RELIEF

36.     Plaintiffs hereby incorporate by reference the allegations contained above as though fully set forth herein.

37.     Defendants' conduct will cause plaintiffs irreparable injury for which no adequate remedy at law exists.

38.     Plaintiffs have a substantial likelihood of success on the merits of their case and the possibility of harm to defendants if injunctive relief is granted is remote, whereas the injury to plaintiffs in the absence of injunctive relief is severe.  As such, the balance of harms weighs decidedly in plaintiffs' favor.

39.     The public interest, to the limited extent it is implicated, is served best by enforcing agreements and ensuring that an apartment complex – which houses numerous families – receives the insurance proceeds to which it is entitled to enable repairs to be made.

40.  .   Plaintiff is entitled to injunctive relief to preclude defendants from continuing their wrongful and tortious conduct and future diversions of insurance and other proceeds from plaintiffs.

SCAN DATE 2011/06/24 15:25

**WHEREFORE**, plaintiffs request this Court enter an Order in favor of plaintiffs and against defendants injunctive relief as follows:

a.) A temporary restraining order and permanent injunction restraining and enjoining defendants and the respective officers, directors, agents and employees, and all other persons acting or planning to act on behalf thereof, from in any manner, directly or indirectly (1) purporting to represent the Property, including all legal and equitable owners thereof, or any beneficiary of any insurance policy pertaining to the Property; or (2) distributing the proceeds of any insurance policy regarding the Property to any party other than the LLC; and

b.) awarding costs and attorneys fees as per §§ 7.4 and 8.4 of the Transition Agreement, §§ 2.07 and 9.03 of the LLC Operating Agreement, and § 10.10 of the Contribution Agreement;

c.) granting all other relief as this Court shall deem just and proper.

## COUNT IV – BREACH OF CONTRACT

41.    Plaintiffs hereby incorporate by reference the allegations contained above as though fully set forth herein.

42.    Defendants breached the Transition Agreement, LLC Operating Agreement, and Contribution Agreement, and plaintiffs were damaged thereby in an amount in excess of $75,000.

**WHEREFORE**, plaintiffs pray for judgment against defendants for damages in an amount in excess of $75,000, plus attorneys fees as per § 8.4 of the Transition Agreement, §§ 2.07 and 9.03 of the LLC Operating Agreement, and § 10.10 of the Contribution Agreement, prejudgment interest, and for all other relief as this Court shall deem just and proper.

SCAN DATE 2011/06/24 15:25

## COUNT V – ACTION FOR ACCOUNTING

43.     Plaintiffs hereby incorporate by reference the allegations contained above as though fully set forth herein.

44.     Defendants owed plaintiffs fiduciary duties and breached those duties by secretly attempting to settle the Insurance Claim and keeping a large portion of the Insurance Proceeds for themselves without plaintiffs' knowledge or consent, by failing to turn over all books and records regarding the Property, and for using apartments within the Property for their employees.

45.     Defendants were entrusted to handle the affairs and property on behalf of plaintiffs in a manner consistent with the agreements between the parties, imposing upon them the burden of an accounting.

46.     The character of the accounts and transactions engaged in by defendants is complicated and involves funds and properties belonging to multiple parties and plaintiffs do not possess an adequate remedy at law.

47.     Discovery is necessary.

48.     Plaintiffs are entitled to a full accounting from defendants regarding the Insurance Claims and Insurance Proceeds.

        **WHEREFORE**, plaintiffs pray for judgment against defendants for a full accounting regarding the Insurance Claims and Insurance Proceeds, all use of the Property by defendants' employees and contractors, and all books and records regarding the Property, plus attorneys fees as per § 8.4 of the Transition Agreement, §§ 2.07 and 9.03 of the LLC Operating Agreement, and § 10.10 of the Contribution Agreement, and for all other relief as this Court shall deem just and proper.

SCAN DATE 2011/06/24  15:25

Respectfully submitted,

CARTER LLP ATTORNEYS

By: _____

Eric C. Carter, Kansas Bar No. 18192
114 N. Cherry, Olathe, KS 66061
913.440.0002 – FAX: 913.397.6700
Eric@CarterLLP.BIZ
ATTORNEYS FOR PLAINTIFFS

SCAN DATE 2011/06/24 15:25

# EXHIBIT

## 1

**CONTRIBUTION AGREEMENT**
Centennial Park Apartments

### ARTICLE 1: PROPERTY/CONTRIBUTION VALUE

    1.1    Certain Basic Terms.

(a) Sponsor and Notice Address:
Maxus Properties, Inc.
Attention: David Johnson
104 Armour Road
Kansas City, MO 64116
Telephone: 816/877-0813
Facsimile: 816/221-1829
E-mail: DJohnson@maxusprop.com

With a copy to:
Robert Thomson, Esq.
Attorney at Law
4324 Bellevue, Suite 201
Kansas City, MO 64111
Telephone:
Facsimile:
E-mail: RThomson@maxusprop.com

(b) Contributors and Notice Address:
The Individual Contributors signing a
Contributors' Signature Page attached hereto
c/o Kennerly, Lamishaw & Rossi LLP
Attention: Howard A. Parelskin
707 Wilshire Boulevard, Suite 1400
Los Angeles, CA 90017
Telephone: 213/426-2075
Facsimile: 213/596-5791
E-mail: howardparelskin@klrfirm.com

(c) Title Company and Escrow Agent:
Assured Quality Title Co.
Attention: Don Rodgers
1001 Walnut
Kansas City, MO 64106
Telephone: 816/221-2880
Facsimile: 816/223-7696
E-mail: drodgers@aqtc.com

(d) Intentionally Deleted.

|     |     |     |
| --- | --- | --- |
| (e) | Date of this Agreement: | April 1, 2011. |
| (f) | Contribution Value: | $15,220,000.00 |
| (g) | Earnest Money: | $205,000.00 (the "Initial Earnest Money"), together with an additional $1,395,000.00 (the "Additional Earnest Money") to be deposited in accordance with the terms of this Agreement. |
| (h) | Closing Date: | May 11, 2011, or such earlier date as the "Lender", Sponsor and Contributors are prepared to close the "New Loan" (as those terms are hereinafter defined), subject to extension if agreed to in accordance with the terms of this Agreement. |

1

SCAN DATE 2011/06/24 15:25

1.2     Property.  Subject to the terms of this Contribution Agreement (this "Agreement"), Contributors agree to contribute to Centennial Park Kansas, LLC, a Kansas limited liability company to be formed pursuant to the terms of this Agreement (the "Company"), the following property (the "Property"):

(a)     The real property described in Exhibit A together with the buildings and improvements thereon (the "Improvements"), and all appurtenances of the above-described real property, including easements or rights-of-way relating thereto, and, without warranty, all right, title, and interest, if any, of Contributors in and to the land lying within any street or roadway adjoining the real property described above or any vacated or hereafter vacated street or alley adjoining said real property.

(b)     All of Contributors' right, title and interest, in and to all fixtures, furniture, equipment, and other tangible personal property, if any, owned by Contributors (the "Personal Property") presently located on such property, but excluding word processing and computer equipment, software and accessories (including, without limitation, CPUs, printers, hubs, switches, firewalls, networking equipment and modems) and any items of personal property owned by tenants, any managing agent or others.

(c)     All of Contributors' interest, as landlord, in the "Leases," being all leases of the Improvements, and all amendments thereto, and including all leases which may be made by Contributors after the Date of this Agreement and before Closing as permitted by this Agreement.

(d)     All of Contributors' right, title and interest, if any, in and to all of the following items, to the extent assignable and without warranty (the "Intangible Personal Property"): (i) licenses, permits, and other governmental approvals and entitlements relating to the Property, (ii) the right to use the name of the Property and existing telephone numbers, fax numbers, and web domains used by the Contributors in connection with the Property, (iii) if still in effect, guaranties and warranties received by Contributors from any contractor, manufacturer or other person in connection with the construction, maintenance, repair or operation of the Property, and (iv) any architectural or engineering plans or drawings related to the Property.

1.3     Earnest Money.  The Initial Earnest Money, in immediately available federal funds, evidencing Sponsor's good faith to perform Sponsor's obligations under this Agreement, shall be deposited by Sponsor with the Escrow Agent on the Date of this Agreement.  On or before April 15, 2011, the Additional Earnest Money (less amounts previously disbursed by Sponsor for the benefit of the Contributors in accordance with Paragraphs 3.2, 3.5 and 5.10, below), in immediately available federal funds, shall be deposited by Sponsor with the Escrow Agent.  The Earnest Money shall be held and disbursed by the Escrow Agent pursuant to the provisions of this Agreement.  At such time as the New Loan (as hereinafter defined) is approved and a Good Faith Deposit is required pursuant to the Loan Application (as hereinafter defined), Escrow Agent is hereby authorized and directed to remit the Initial Earnest Money to Lender (as hereinafter defined).  The Earnest Money shall be deemed non-refundable and shall be held and disbursed for the benefit of Contributors in the event of a later termination of this Agreement for any reason other than as a result of a material default by Contributors or a material default by American Spectrum Realty Management, LLC ("ASRM") in the performance of its obligations under that certain Transition Agreement with the Contributors, executed and delivered contemporaneously herewith (the "Transition Agreement").  If this Agreement terminates for any other reason, unless expressly provided to the contrary, the Earnest Money shall be held and disbursed to or for the benefit of Contributors, in accordance with the provisions of Paragraph 8.1, below.  Contemporaneously with receipt of the Earnest Money, Escrow Agent shall provide an insured closing letter to and for the benefit of the Contributors and Lender.

SCAN DATE 2011/05/24  15:25

## ARTICLE 2: DUE DILIGENCE

2.1    Property Information.    Sponsor acknowledges that Sponsor or an affiliated entity is currently an owner of an undivided interest in the Property, that Sponsor is a sophisticated real estate investor knowledgeable about the condition of the Property, and Sponsor has agreed to acquire its interest in the Property and enter into this Agreement without the benefits of any additional inspections or investigations of the Property.

2.2    Inspections in General.    This Agreement is not to be conditioned on the outcome of unperformed due diligence by Sponsor, including without limitation a title examination of the Property. However, during the pendency of this Agreement, Sponsor, its agents, and employees shall have the right to enter upon the Property for the purpose of making non-invasive inspections at Sponsor's sole risk, cost and expense. All of such entries upon the Property shall be at reasonable times during normal business hours and after at least one Business Days' prior notice to Contributors, and Contributors' agent shall have the right to accompany Sponsor during any activities performed on the Property. Sponsor shall not contact any tenant of the Property, or any other third person regarding the Property without the prior written consent of Contributors. If any inspection or test disturbs the Property, Sponsor will restore the Property to the same condition as existed before the inspection or test. SPONSOR SHALL DEFEND, INDEMNIFY CONTRIBUTORS AND HOLD CONTRIBUTORS, CONTRIBUTORS' TRUSTEES, MEMBERS, MANAGERS, DIRECTORS, OFFICERS, TENANTS, AGENTS, CONTRACTORS AND EMPLOYEES, CONTRIBUTORS' AFFILIATES (HEREINAFTER DEFINED) AND THE PROPERTY HARMLESS FROM AND AGAINST ANY AND ALL ACTIONS, LOSSES, COSTS, DAMAGES, CLAIMS, OR LIABILITIES, INCLUDING BUT NOT LIMITED TO, MECHANIC'S AND MATERIALMEN'S LIENS AND ATTORNEYS' FEES, ARISING OUT OF OR IN CONNECTION WITH SPONSOR'S ENTRY UPON OR INSPECTION OF THE PROPERTY AS ALLOWED HEREIN. "Contributors' Affiliates" means (a) any entity that directly or indirectly controls, is controlled by or is under common control with Contributors (or any of them), or (b) any entity at least a majority of whose economic interest is owned by Contributors (or any of them); and the term "control" means the power to direct the management of such entity through voting rights, ownership or contractual obligations. The provisions of this paragraph shall survive the Closing or the earlier termination of this Agreement.

2.3    Confidentiality of Property Information.    All information, other than matters of public record or matters generally known to the public, furnished to, or obtained through inspection of the Property by, Sponsor, its affiliates, lenders, employees, partners, attorneys, accountants, advisors and other professionals or agents relating to the Property, will be treated by Sponsor, its affiliates, lenders, employees, partners, attorneys, accountants, advisors and agents as confidential, and will not be disclosed to anyone other than on a need-to-know basis and to Sponsor's consultants who agree to maintain the confidentiality of such information. If this Agreement is terminated or if for any reason the Closing does not occur, Sponsor shall promptly return the such information to Contributors and, if requested, shall deliver all third party studies and reports obtained during the course of Sponsor's inspections and investigations to Contributors, without recourse or warranty. The confidentiality provisions of this Paragraph 2.3 shall not apply to any disclosures made by Sponsor as required by law, by court order, or in connection with any subpoena served upon Sponsor; provided Sponsor shall provide Contributors with written notice before making any such disclosure.

2.4    Sponsor's Reliance on its Investigations.    To the maximum extent permitted by applicable law, the contribution of the Property to the Company by Contributors is made and will be made without representation, covenant, or warranty of any kind (whether express, implied, or, to the maximum extent permitted by applicable law, statutory) by Contributors, except to the extent expressly set forth in Paragraph 7.1, below. As a material part of the consideration for this Agreement, Sponsor agrees to accept the Property on an "as is" and "where is" basis, with all faults, and without any

SCAN DATE 2011/05/24  15:25

representation or warranty, all of which Contributors hereby disclaim. No warranty or representation is made by Contributors as to fitness for any particular purpose, merchantability, design, quality, condition, operation or income, compliance with drawings or specifications, absence of defects, absence of hazardous or toxic substances, absence of faults, flooding, or compliance with laws and regulations including, without limitation, those relating to health, safety, and the environment. Sponsor acknowledges that Sponsor has entered ' : '.': Agreement with the intention of making and relying upon its own investigation of the physical, environmental, economic use, compliance, and legal condition of the Property and that Sponsor is not now relying, and will not later rely, upon any representations and warranties made by Contributors or anyone acting or claiming to act, by, through or under or on Contributors' behalf concerning the Property.  The provisions of this <u>Paragraph 2.4</u> shall survive indefinitely any Closing or termination of this Agreement and shall not be merged into the Deed or any of the other Closing documents.

<u>ARTICLE 3: PURPOSE OF TRANSACTION</u>

3.1     The parties understand that the purpose of the transaction contemplate hereby is to permit the Contributors, the current owners of the Property, to payoff and refinance their current first mortgage loan (the "<u>Existing Loan</u>"), and to enter into a new loan (the "<u>New Loan</u>") on the terms outlined in the Loan Application dated 2/10/2011 (the "<u>Loan Application</u>").  In order to accomplish that objective, it is anticipated that, prior to the Closing Date:

(a)     Sponsor or its Affiliate and the Contributors will enter into a new Limited Liability Operating Agreement for the Company, in the form attached hereto as <u>Exhibit Y</u> (the "<u>Operating Agreement</u>"), with Sponsor as the Managing Member.  When completing the Operating Agreement, the initial capital contribution of the Sponsor shall be determined by the amount of "Required Cash Contribution" (as that term is defined below), and the initial capital contribution of the Contributors shall be determined by each Contributors proportionate ownership interest in the Property prior to contribution, based on the appraised value of the Property being $15,220,000. The value of the initial capital contributions for Sponsor and Contributors shall be subject to the reasonable approval of Sponsor and a majority-in-interest of the Contributors.

(b)     The Company will enter into a Property Management Agreement with an affiliate of the Sponsor, in the form attached hereto as <u>Exhibit Z</u> (the "<u>Management Agreement</u>").

(c)     The Company will execute and deliver a promissory note and all of the other loan documents necessary or appropriate to consummate the New Loan (the "<u>Loan Documents</u>") in an amount not less than $10,250,000, to be originated by NorthMarq Capital, LLC ("<u>Lender</u>") in accordance with the terms outlined in the Loan Application, with the exception that the Managing Member of the Company (and the non-recourse carve out guarantor and environmental indemnitor) shall be Sponsor or an Affiliate of Sponsor, and not American Spectrum Realty, Inc. ("<u>American Spectrum</u>"), and the Financing Fee payable to Lender shall be 0.50% of the proposed loan amount.

3.2     Concurrently with execution and delivery of this Agreement by Sponsor, Sponsor shall remit to Lender and/or American Spectrum the sum of $40,250 on account of the Third Party Expense Deposit, Legal Deposit, Freddie Mac Application Fee and Capital Services Application Fee previously paid to Lender by American Spectrum (the "<u>Lender Fees</u>"), and shall cause that same amount previously deposited by American Spectrum or its affiliate to be refunded to American Spectrum by either Lender or Sponsor.  Concurrently with execution and delivery of this Agreement by Sponsor and Contributors, Sponsor shall remit to Kennerly Lamishaw & Rossi, LLP ("<u>KLR</u>"), counsel to the Contributors, the sum of $12,500 as an additional retainer on behalf of the Contributors (the "<u>Legal Fees</u>"), to be held and disbursed their engagement letter dated October 6, 2010.  Sponsor agrees to remit (or to direct Escrow

SCAN DATE 2011/06/24  15:25

Agent to remit) an additional $12,500 to KLR upon closing of the New Loan. Amounts advanced by Sponsor pursuant to this Paragraph 3.2 shall be considered a part of the Required Cash Contribution of Sponsor and at Closing shall be credited to Sponsor as part of Sponsor's initial capital contribution to the Company.

3.3     Sponsor shall diligently and faithfully pursue approval of the New Loan, on terms substantially the same as those reflected in the Loan Application. At such time as the Loan Application is approved, Escrow Agent is hereby authorized and directed to remit the Earnest Money to Lender on account of the Good Faith Deposit required to be made under the Loan Application (the "Good Faith Deposit"), and Sponsor and Contributors shall thereafter together diligently and faithfully pursue a closing of the New Loan and the transactions contemplated hereby. Sponsor shall not be liable for default interest or other extraordinary costs incurred prior to May 11, 2011, on account of extension of the maturity date of the Existing Loan to that date. If approval of the New Loan is not obtained on or before May 11, 2011, then Sponsor shall either cause the existing loan to be extended without cost or penalty to the Contributors until the New Loan can be consummated, Closing can take place, and the existing loan paid in full, or Sponsor shall provide a new, interim loan on the same terms and conditions as the Existing Loan (but due no sooner than the Closing hereunder when the New Loan is funded) (the "Interim Loan"), with no additional costs or expenses to Contributors of the Company, in which event the Closing Date may be extended up to the date of such extension, but in no event more than sixty (60) days following the originally scheduled Closing Date (unless Sponsor has funding and continues to maintain the Interim Loan); or Contributors may otherwise elect to declare Sponsor to be in default hereunder, the Earnest Money shall be disbursed to Contributors in accordance with the provisions of Paragraph 8.1, below, and neither party shall incur any further obligations or liability under this Agreement, with the exception of those matters which expressly survive termination or Closing.

3.4     Sponsor shall use diligent and good faith efforts to minimize the amount of additional funds that will be required to consummate the New Loan and thereafter operate the Property, but agrees on the Closing Date to contribute to the Company through the Escrow Agent the funds required pursuant to Section 3.01(a) of the Operating Agreement (the "Required Cash Contribution").

3.5     The parties agree to use their best efforts to cause management of the Property to be turned over to Maxus Properties, Inc. ("Maxus") effective April 15, 2011 (the "Turnover Date"). In that regard, the parties agree that, on or before the Turnover Date:

(a)     Sponsor and Contributors shall deliver to Escrow Agent the documents described in Paragraphs 5.3 and 5.4.

(b)     Contributors shall use their best efforts to obtain from ASRM the documents which are to be executed and delivered by ASRM under the Transition Agreement.

(c)     Sponsor shall deliver the Additional Earnest Money to Escrow Agent ($1,395,000, less amounts previously paid by Sponsor for the benefits of Contributors in accordance with Paragraph 3.2, above, and Paragraph 5.10, below).

(d)     Contributors shall use their best efforts to install Maxus as property manager and asset manager, in accordance with the terms of the Property Management Agreement (except that the Contributors, rather than the Company, shall be the "owner" until Closing).

SCAN DATE 2011/05/24  15:25

## ARTICLE 4: OPERATIONS AND RISK OF LOSS

4.1     Ongoing Operations.  During the pendency of this Agreement, Contributors shall carry on its business and activities relating to the Property, including leasing of the Property, substantially in the same manner as it did before the Date of this Agreement.

4.2     Performance Under Leases and Service Contracts.  During the pendency of this Agreement, Contributors will perform their material obligations under the Leases and Service Contracts and other agreements that may affect the Property.

4.3     New Contracts; New Leases.  During the pendency of this Agreement, Contributors will not enter into any service contract or similar obligation that will be an obligation affecting the Property subsequent to the Closing, except contracts entered into in the ordinary course of business that are terminable without cause upon no more than 30-days' notice and without penalty or cancellation fee, without the prior consent of Sponsor, which shall not be unreasonably withheld or delayed.

4.4     Service Contracts.  The Property shall be conveyed to the Company subject to, and the Company shall assume all Service Contracts (other than any property management or leasing services contract) that are in place as of the Closing Date, with the exception of any property management or leasing agreement, which shall be terminated as of the Closing Date.

4.5     Damage or Condemnation.  Risk of loss resulting from any condemnation or eminent domain proceeding which is commenced or has been threatened before the Closing, and risk of loss to the Property due to fire, flood or any other cause before the Closing, are hereby assumed by Sponsor and the Company. If before the Closing the Property or any portion thereof shall be materially damaged, or if the Property or any material portion thereof shall be subjected to a bona fide threat of condemnation or shall become the subject of any proceedings, judicial, administrative or otherwise, with respect to the taking by eminent domain or condemnation, this Agreement shall remain in full force and effect and the contribution contemplated herein, less any interest taken by eminent domain or condemnation, shall be effected with no further adjustment, and upon the Closing of this transaction, Contributors shall assign, transfer and set over to the Company all of the right, title and interest of Contributors in and to any awards that have been or that may thereafter be made for such taking, and Contributors shall assign, transfer and set over to the Company any insurance proceeds that may thereafter be made for such damage or destruction.

## ARTICLE 5: CLOSING

5.1     Closing.  The consummation of the transaction contemplated herein ("Closing") shall occur on the Closing Date at the offices of the Escrow Agent.

5.2     Conditions to the Parties' Obligations to Close.

(a)     The obligation of Sponsor to consummate the transaction contemplated hereunder is contingent upon the following:

(i)     Each Contributor (with the exception of the Contributor affiliated with Sponsor) has executed this Agreement, the Operating Agreement and the Transition Agreement, and each such Contributors' representations and warranties contained herein shall be true and correct in all material respects as of the Date of this Agreement and the Closing Date;

6

SCAN DATE 2011/06/24  15:25

(ii)    As of the Turnover Date and as of the Closing Date, Contributors shall have performed their obligations hereunder and all deliveries to be made at Closing have been tendered;

(iii)    There shall exist no actions, suits, arbitrations, claims, attachments, proceedings, assignments for the benefit of creditors, insolvency, . . . . . . . . . . organization or other proceedings, pending or threatened against Contributors that would materially and adversely affect Contributors' ability to perform its obligations under this Agreement; and

(iv) The Title Company is committed to issue its title policy, subject only to matters of record as of the Date of this Agreement and the New Loan, and matters arising out of the acts or omissions of Sponsor or its affiliates.

(b)    The obligation of Contributors to consummate the transaction contemplated hereunder is contingent upon the following:

(i)    Approval of the Loan Application by Lender, and approval of the Loan Documents by Contributors;

(ii)    Sponsor and or its affiliate shall have executed the Operating Agreement;

(iii)    American Spectrum shall have executed the Transition Agreement, and shall have performed its obligations and made are required deliveries thereunder;

(iv)    Sponsor's representations and warranties contained herein shall be true and correct in all material respects as of the Date of this Agreement and the Closing Date;

(v)    As of the Turnover Date and as of the Closing Date, Sponsor shall have performed its obligations hereunder and all deliveries to be made at Closing have been tendered; and

(vi)    There shall exist no actions, suits, arbitrations, claims, attachments, proceedings, assignments for the benefit of creditors, insolvency, bankruptcy, reorganization or other proceedings, pending or threatened against Sponsor that would materially and adversely affect Sponsor's ability to perform its obligations under this Agreement.

So long as a party is not in default hereunder, if any condition to such party's obligation to proceed with the Closing hereunder has not been satisfied as of the Closing Date, such party may, in its sole discretion, terminate this Agreement by delivering written notice to the other party on or before the Closing Date, or elect to close, notwithstanding the non-satisfaction of such condition, in which event such party shall be deemed to have waived any such condition. If such party elects to close, notwithstanding the nonsatisfaction of such condition, there shall be no liability on the part of the other party for nonsatisfaction of such condition or for breaches of representations and warranties of which the party electing to close had knowledge as of the Closing.

5.3    Contributors' Deliveries in Escrow. On or before the Turnover Date, Contributors shall deliver in escrow to the Escrow Agent the following:

(a)    Deed. A special or limited warranty deed (warranting title for acts by, through or under Contributor) (the "Deed") in the form provided for under the law of the state where the Real Property is located, or otherwise in conformity with the custom in such jurisdiction and satisfactory to Contributors,

SCAN DATE 2011/06/24 15:25

executed and acknowledged by Contributors (each of them), conveying Contributors' title to the Real Property.

(b)    Bill of Sale and Assignment of Leases and Contracts.  A Bill of Sale and Assignment of Leases and Service Contracts in the form of Exhibit B attached hereto (the "Assignment"), executed by Contributors (each of them).

(c)    State Law Disclosures.  Such disclosures and reports as are required by applicable state and local law in connection with the conveyance of real property.

(d)    FIRPTA.  A Foreign Investment in Real Property Tax Act affidavit executed by Contributors, if required.

(e)    LLC Documents.  Counterparts of the Operating Agreement, duly executed by each Contributor.

(f)    Additional Documents.  Any additional documents that Escrow Agent or the Title Company may reasonably require for the proper consummation of the transaction contemplated by this Agreement.

5.4    Sponsor's Deliveries in Escrow.  On or before the Turnover Date, Sponsor shall deliver in escrow to the Escrow Agent the following:

(a)    Initial Contribution.  The Required Cash Contribution shall be deposited by Sponsor with the Escrow Agent in immediate, same-day federal funds wired for credit into the Escrow Agent's escrow account.

(b)    LLC Documents.  Counterparts of the Operating Agreement, the Management Agreement, and any other document required to be delivered pursuant to the terms of the Operating Agreement, duly executed by Sponsor.

(c)    Loan Documents.  Counterparts of the Loan Documents and any other documents or instruments required to be delivered pursuant to the terms of the Loan Application in order to consummate the New Loan, duly executed by Sponsor, in the required capacity.

(d)    Additional Documents.  Any additional documents that Lender, Contributors, Escrow Agent or the Title Company may reasonably require for the proper consummation of the transaction contemplated by this Agreement.

5.5    Closing Statements; Disbursement of Funds.  At the Closing, Contributors and Sponsor shall deposit with the Escrow Agent executed closing statements consistent with this Agreement in the form required by the Escrow Agent.  At Closing, the proceeds of the New Loan shall be applied to satisfy the Existing Loan.  At Closing, the remaining Earnest Money shall be applied as follows:

(a)    To pay any additional amounts needed to satisfy the Existing Loan;

(b)    To pay any additional amounts due to or required by Lender on account of the New Loan, including amounts due for lender costs, immediate repairs, replacement reserves, insurance and tax escrows and the like;

8

SCAN DATE 2011/06/24 15:25

(c)   To pay any additional closing costs hereunder, including the cost of the owner's title policy, and any remaining amounts due pursuant to Paragraph 3.2, above; and

(c)   To pay to the Company such amounts which have been reasonably agreed upon by Sponsor and Contributors to be held as reserves, and operating capital, with the balance to be returned to Sponsor.

5.6   Possession.  Contributors shall deliver possession of the Property to the Company at the Closing, subject to the Leases, the Service Contracts and all matters of record.

5.7   Consummation of New Loan.  At Closing, the New Loan shall be funded in accordance with its terms, and the existing loan encumbering the Property shall be satisfied and paid in full.

5.8   Title Policy.  At Closing, the Company shall obtain an appropriate owner's policy of title insurance showing title vested in the Company with a property value of $15,220,000, and shall provide Lender with a lender's policy of title insurance in the principal amount of the New Loan and in form and substance adequate to satisfy the Lender.  The title policies shall be issued by First American Title Insurance Company, and any cancellation fees charged by First American's Santa Ana office shall be the responsibility of the Title Company.

5.9   Notice to Tenants.  The Company shall deliver to each tenant immediately after the Closing a notice regarding the sale in substantially the form Exhibit C attached hereto, or such other form as may be required by applicable state law.

5.10   Costs.  Except as expressly provided in this Agreement, all costs incurred in connection with the Closing shall be borne by the Company from the Required Cash Contribution.  Closing costs shall include a financing fee in the amount of $76,875.00 payable to American Spectrum, and $25,625.00 payable to Sponsor, in addition to the Financing Fee due to Lender.

5.11   Close of Escrow.  The Escrow Agent, as agent for the Title Company, shall agree in writing with Contributors and Sponsor that (1) recordation of the Deed constitutes its representation that it is holding the closing documents, closing funds and closing statement and is prepared and irrevocably committed to disburse the closing funds in accordance with the closing statements and (2) release of funds to the Lender shall irrevocably commit it to issue the Title Policy in accordance with this Agreement. Upon satisfaction or completion of the foregoing conditions and deliveries, the parties shall direct the Escrow Agent to immediately record and deliver the documents described above to the appropriate parties and make disbursements according to the closing statements executed by Contributors and Sponsor and in accordance with escrow instructions by each party consistent with this Agreement.

## ARTICLE 6: PRORATIONS

6.1   Prorations.  There shall be no prorations.  Following Closing, the Company shall assume all outstanding obligations of the Contributors with respect to the Property, as reflected in financial statements to be provided by Contributors' property manager, including all obligations with respect to Leases and Service Contracts.

## ARTICLE 7: REPRESENTATIONS AND WARRANTIES

7.1   Contributors' Representations and Warranties.  As a material inducement to Sponsor to execute this Agreement and consummate this transaction, Contributors represents and warrants to Sponsor that:

SCAN DATE 2011/06/24 15:25

(a)     Organization and Authority. Contributors (or each of them) has been duly organized and is validly existing as limited liability companies, in good standing in their state of formation and qualified to do business in the state in which the Property is located if required by applicable law. Contributors have the full right and authority and has obtained any and all consents required to enter into this Agreement and to consummate or cause to be consummated the transactions contemplated hereby. This Agreement has been, and all of the documents to be delivered by Contributors at the Closing will be, authorized and properly executed and constitutes, or will constitute, as appropriate, the valid and binding obligation of Contributors, enforceable in accordance with their terms.

(b)     Conflicts and Pending Action. There is no agreement to which Contributors is a party or to Contributors' knowledge binding on Contributors which is in conflict with this Agreement. There is no action or proceeding pending or, to Contributors' knowledge, threatened against the Property or Contributors, including condemnation proceedings, which relates to the Property, the Security Deposits or the Leases, or challenges or impairs Contributors' ability to execute or perform its obligations under this Agreement.

(c)     Rent Roll and Operating Statements. The Rent Roll provided or to be provided to Sponsor is or will be true, correct and complete in all material respects as of the date thereof. The Operating Statements were prepared by or for Contributors in the ordinary course of its business in the same manner as it prepares or obtains such reports for its other properties and are the Operating Statements used and relied upon by Contributors in connection with their operation of the Property.

(d)     Service Contracts. To Contributors' knowledge, the list of Service Contracts delivered or to be delivered to Sponsor pursuant to this Agreement is or will be true, correct, and complete as of the date of its delivery. Neither Contributors nor, to Contributors' knowledge, any other party is in material default under any Service Contract.

(e)     Violations. To Contributors' knowledge, Contributors have not received written notice from any governmental entity of any material violation by Contributors of any law, rule or regulation affecting the Property or its use including any environmental law or regulation, nor any written notice that the Property is in violation of any applicable building or zoning code or ordinance, except for any such matters which may have been previously cured by Contributors or which have been or will be disclosed to Sponsor pursuant to the terms of this Agreement.

(f)     Compliance with International Trade Control Laws and OFAC Regulations. Contributors (without reference to its constituent entities) is not now nor shall it be at any time prior to or at the Closing an individual, corporation, partnership, joint venture, association, joint stock company, trust, trustee, estate, limited liability company, unincorporated organization, real estate investment trust, government or any agency or political subdivision thereof, or any other form of entity (collectively, a "Person") named in any executive orders or lists published by the Office of Foreign Assets Control, Department of the Treasury ("OFAC") as Persons with whom a United States Citizen (a "U.S. Person") may not transact business or must limit their interactions to types approved by OFAC ("Specially Designated Nationals and Blocked Persons").

"Contributors' knowledge," as used in this Agreement means the current actual knowledge of Contributors, without any duty of inquiry or investigation. Sponsor's sole remedy in the event of a material breach of any of the foregoing representations and warranties discovered prior to Closing shall be to elect either to terminate this Agreement and receive a refund of the Earnest Money, following which neither party shall have any further obligations hereunder, or to proceed to Closing, waiving any claim against Contributors and releasing Contributors from any liability or obligations in connection therewith. Contributors' maximum aggregate liability for damages arising from all breaches of the foregoing

10

SCAN DATE 2011/06/24 15:25

representations discovered after Closing shall be limited to Sponsor's actual damages (and specifically excluding consequential, punitive and exemplary damages) not to exceed an amount equal to the aggregate Earnest Money deposit made by Sponsor pursuant to this Agreement.

7.2     Sponsor's Representations and Warranties.  As a material inducement to Contributors to execute this Agreement and consummate this transaction, Sponsor represents and warrants to Contributors that:

(a)     Organization and Authority.  Sponsor has been duly organized and is validly existing as a limited liability company, in good standing in the state of its organization and is, or prior to Closing will be, qualified to do business in the state in which the Real Property is located if required by applicable law. Sponsor has the full right and authority and has obtained any and all consents required to enter into this Agreement and to consummate or cause to be consummated the transactions contemplated hereby. This Agreement has been, and all of the documents to be delivered by Sponsor at the Closing will be, authorized and properly executed and constitutes, or will constitute, as appropriate, the valid and binding obligation of Sponsor, enforceable in accordance with their terms.

(b)     Conflicts and Pending Action.  There is no agreement to which Sponsor is a party or to Sponsor's knowledge binding on Sponsor which is in conflict with this Agreement. There is no action or proceeding pending or, to Sponsor's knowledge, threatened against Sponsor which challenges or impairs Sponsor's ability to execute or perform its obligations under this Agreement.

(c)     Compliance with International Trade Control Laws and OFAC Regulations.  Sponsor (without reference to its constituent entities) is not now nor shall it be at any time prior to or at the Closing a Person named in any executive orders or lists published by OFAC as a Specially Designated National and Blocked Person.

## ARTICLE 8: DEFAULT AND DAMAGES

8.1     Default by Sponsor.  If Sponsor shall default in its obligation to close hereunder or otherwise defaults in its obligations hereunder, Sponsor agrees that Contributors shall have the right to direct the Escrow Agent to deliver the "Liquidated Damages Amount" (as hereinafter defined) to or for the benefit of Contributors as liquidated damages to recompense Contributors for time spent, labor and services performed, and the loss of its bargain, such funds to be applied either (i) to pay down the principal balance of the Existing Loan, or (ii) applied to the costs associated with the New Loan, if available on commercially reasonable terms acceptable to the Contributors, or (iii) otherwise to be applied for the benefit of the Contributors, in each case as dictated by a majority-in-interest of the Contributors, without further consent, direction or approval of Sponsor. Sponsor and Contributors have considered carefully the loss to Contributors occasioned as a consequence of the negotiation and execution of this Agreement, by terminating negotiations and activities with American Spectrum, the expenses of Contributors incurred in connection with the preparation of this Agreement and Contributors' performance hereunder, and the other damages, general and special, which Sponsor and Contributors realize and recognize Contributors will sustain but which Sponsor and Contributors agree would be impracticable or extremely difficult to calculate at this time if Sponsor so defaults. Based on all those considerations, Sponsor and Contributors agree that the Liquidated Damages Amount, together with the interest thereon, represents a reasonable estimate of Contributors' damages. Contributors agrees to accept the Liquidated Damages Amount (together with any amounts due to Contributors to enforce this Agreement in accordance with Paragraph 10.10, below) as Contributors' total damages and relief hereunder if Sponsor defaults in its obligations to close hereunder, Contributors waiving all other rights and remedies. Any Earnest Money held by Escrow Agent in excess of the Liquidated Damages Amount

SCAN DATE 2011/05/24 15:25

shall be remitted to Sponsor upon termination of this Agreement and disbursement of the full amount of the Liquidated Damages Amount to or for the benefit of Contributors.

For purposes of this Paragraph 8.1, "Liquidated Damages Amount" shall mean the sum of $500,000.00, reduced by: (i) the Initial Deposit, to the extent disbursed as the Good Faith Deposit on account of the New Loan, (ii) $40,250, or so much thereof which has been paid by Sponsor to ASRM or to Lender on account of Lender Fees, as contemplated by Paragraph 3.2, (iii) $12,500, or so much thereof which has been paid by Sponsor to KLR on account of Legal Fees, as contemplated by Paragraph 3.2, and (iv) $76,875, or so much thereof which has been paid by Sponsor to ASRM as a financing fee, as contemplated by Paragraph 5.10.

8.2     Default by Contributors.  If Contributors defaults in its obligation to sell and convey the Property to Sponsor pursuant to this Agreement, Sponsor's sole remedy shall be to elect one of the following: (a) to terminate this Agreement, in which event Sponsor shall be entitled to the return by the Escrow Agent or Contributors, as applicable, to Sponsor of the Initial Earnest Money and any Additional Earnest Money, or (b) to bring a suit for specific performance provided that any suit for specific performance must be brought within 90 days of Contributors' default, to the extent permitted by law; Sponsor waiving the right to bring suit at any later date.  Sponsor agrees not to file a lis pendens or other similar notice against the Property except in connection with, and after, the proper filing of a suit for specific performance.

8.3     The provisions of this Article 8 shall survive any termination of this Agreement.

### ARTICLE 9: EARNEST MONEY PROVISIONS

9.1     Investment and Use of Funds.  The Escrow Agent shall invest the Earnest Money in government insured interest-bearing accounts satisfactory to Sponsor, shall not commingle the Earnest Money with any funds of the Escrow Agent or others, and shall promptly provide Sponsor and Contributors with confirmation of the investments made.  If the Closing under this Agreement occurs, the Escrow Agent shall apply the Earnest Money (which includes any interest accrued thereon while the Earnest Money is in escrow) against the Purchase Price due Contributors at Closing.

9.2     Contract Terminations.  Upon a termination of this Agreement, either party to this Agreement (the "Terminating Party") may give written notice to the Escrow Agent and the other party (the "Non-Terminating Party") of such termination and the reason for such termination.  Such request shall also constitute a request for the release of the Earnest Money to the Terminating Party if so entitled under this Agreement.  The Non-Terminating Party shall then have five business days in which to object in writing to the release of the Earnest Money to the Terminating Party.  If the Non-Terminating Party provides such an objection, and the Earnest Money is in the possession of Escrow Agent, then the Escrow Agent shall retain the Earnest Money until it receives written instructions executed by both Contributors and Sponsor as to the disposition and disbursement of the Earnest Money, or until ordered by final court order, decree or judgment, which is not subject to appeal, to deliver the Earnest Money to a particular party, in which event the Earnest Money shall be delivered in accordance with such notice, instruction, order, decree or judgment.

9.3     Interpleader.  Contributors and Sponsor mutually agree that in the event of any controversy regarding the Earnest Money, unless mutual written instructions are received by the Escrow Agent directing the Earnest Money's disposition, the Escrow Agent shall not take any action, but instead shall await the disposition of any proceeding relating to the Earnest Money or, at the Escrow Agent's option, the Escrow Agent may interplead all parties and deposit the Earnest Money with a court of competent jurisdiction in which event the Escrow Agent may recover all of its court costs and reasonable

SCAN DATE 2011/05/24 15:25

attorneys' fees. Contributors or Sponsor, whichever loses in any such interpleader action, shall be solely obligated to pay such costs and fees of the Escrow Agent, as well as the reasonable attorneys' fees of the prevailing party in accordance with the other provisions of this Agreement.

9.4     Liability of Escrow Agent. The parties acknowledge that the Escrow Agent is acting solely as a stakeholder at their request and for their convenience, that the Escrow Agent shall not be deemed to be the agent of either of the parties, and that the Escrow Agent shall not be liable to either of the parties for any action or omission on its part taken or made in good faith, and not in disregard of this Agreement, but shall be liable for its negligent acts and for any loss, cost or expense incurred by Contributors or Sponsor resulting from the Escrow Agent's mistake of law respecting the Escrow Agent's scope or nature of its duties.   CONTRIBUTORS AND SPONSOR SHALL JOINTLY AND SEVERALLY INDEMNIFY AND HOLD THE ESCROW AGENT HARMLESS FROM AND AGAINST ALL COSTS, CLAIMS AND EXPENSES, INCLUDING REASONABLE ATTORNEYS' FEES, INCURRED IN CONNECTION WITH THE PERFORMANCE OF THE ESCROW AGENT'S DUTIES HEREUNDER, EXCEPT WITH RESPECT TO ACTIONS OR OMISSIONS TAKEN OR MADE BY THE ESCROW AGENT IN BAD FAITH, IN DISREGARD OF THIS AGREEMENT OR INVOLVING NEGLIGENCE ON THE PART OF THE ESCROW AGENT.

### ARTICLE 10: MISCELLANEOUS

10.1     Parties Bound. Except for an assignment pursuant to this Paragraph 10.1 or Paragraph 10.16, neither party may assign this Agreement without the prior written consent of the other, and any such prohibited assignment shall be void. No assignment permitted under this Agreement shall relieve the assigning party of any liability hereunder, whether arising before or after the date of such assignment. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the respective legal representatives, successors, assigns, heirs, and devisees of the parties.

At Closing, Sponsor shall be permitted to assign this Agreement, the Earnest Money, and the rights of "Sponsor" in connection therewith, to a Sponsor's Affiliate (as hereinafter defined) without the prior written consent of Contributors,  provided that Sponsor delivers written notice of its intent to do so at least five (5) Business Days prior to the Closing Date. "Sponsor's Affiliate" means (a) any entity that directly or indirectly controls, is controlled by or is under common control with Sponsor, or (b) any entity at least a majority of whose economic interest is owned by Sponsor or the members of Sponsor; and the term "control" means the power to direct the management of such entity through voting rights, ownership or contractual obligations.

10.2     Confidentiality. The Property Information and all other information, other than matters of public record or matters generally known to the public, furnished to, or obtained through inspection of the Property by, Sponsor, its affiliates, lenders, attorneys, accountants and other professionals or agents relating to the Property, will be treated by Sponsor, its affiliates, lenders, employees and agents as confidential, and will not be disclosed to anyone other than representatives and consultants of Sponsor, on a need-to-know basis, who agree to maintain the confidentiality of such information, and will be returned to Contributors by Sponsor if the Closing does not occur. Sponsor shall make no public announcement or disclosure of this Agreement or any non-public information related to this Agreement to outside brokers or third parties before the Closing, without the prior written consent of Contributors. Sponsor shall not record this Agreement or any memorandum of this Agreement. The confidentiality provisions of this Paragraph 10.2 shall not apply to any disclosures made by Sponsor as required by law, by court order, or in connection with any subpoena served upon Sponsor; provided Sponsor shall provide Contributors with written notice before making any such disclosure. The provisions of this Paragraph 10.2 shall survive Closing and the delivery and recordation of the Deed.

SCAN DATE 2011/05/24  15:26

10.3   Headings. The article and paragraph headings of this Agreement are for convenience only and in no way limit or enlarge the scope or meaning of the language hereof.

10.4   Invalidity and Waiver. If any portion of this Agreement is held invalid or inoperative, then so far as is reasonable and possible the remainder of this Agreement shall be deemed valid and operative, and effect shall be given to the intent manifested by the portion held invalid or inoperative. The failure by either party to enforce against the other any term or provision of this Agreement shall not be deemed to be a waiver of such party's right to enforce against the other party the same or any other such term or provision in the future.

10.5   Governing Law. This Agreement shall, in all respects, be governed, construed, applied, and enforced in accordance with the law of the state in which the Property is located.

10.6   Survival. Unless otherwise expressly stated in this Agreement, each of the covenants, obligations, representations, and agreements contained in this Agreement shall survive the Closing and the execution and delivery of the Deed required hereunder only for a period of 6 months immediately following the Closing Date; provided, however the indemnification provisions of Paragraph 2.3, 6.4 and 6.6 and the provisions of Paragraph 6.2 shall survive the termination of this Agreement or the Closing, whichever occurs, and shall not be merged, until the applicable statute of limitations with respect to any claim, cause of action, suit or other action relating thereto shall have fully and finally expired. Any claim brought after Closing based upon a misrepresentation or a breach of a warranty contained in Article 7 of this Agreement shall be actionable or enforceable if and only if: (i) notice of such claim is given to the party which allegedly made such misrepresentation or breached such covenant, obligation, warranty or agreement within 6 months after the Closing Date; and (ii) the amount of damages or losses as a result of such claim suffered or sustained by the party making such claim exceeds $50,000.

10.7   No Third Party Beneficiary. This Agreement is not intended to give or confer any benefits, rights, privileges, claims, actions, or remedies to any person or entity as a third party beneficiary or otherwise.

10.8   Entirety and Amendments. This Agreement embodies the entire agreement between the parties and supersedes all prior agreements and understandings relating to the Property except for any confidentiality agreement binding on Sponsor, which shall not be superseded by this Agreement. This Agreement may be amended or supplemented only by an instrument in writing executed by the party against whom enforcement is sought.

10.9   Time. Time is of the essence in the performance of this Agreement.

10.10   Attorneys' Fees. Should either party employ attorneys to enforce any of the provisions hereof, the party against whom any final judgment is entered agrees to pay the prevailing party all reasonable costs, charges, and expenses, including attorneys' fees, expended or incurred in connection therewith.

10.11   Notices and Deliveries. All notices required or permitted hereunder shall be in writing and shall be served on the parties at the addresses set forth in Paragraph 1.1. Any such notices shall be either (a) sent by overnight delivery using a nationally recognized overnight courier, in which case notice shall be deemed delivered one Business Day after deposit with such courier, (b) sent by facsimile, with written confirmation by overnight or first class mail, in which case notice shall be deemed delivered upon receipt of confirmation transmission of such facsimile notice, or (c) sent by personal delivery, in which case notice shall be deemed delivered upon receipt. Any notice sent by facsimile or personal delivery and delivered after 5:00 p.m. local time where the Property is located shall be deemed received on the next

14

SCAN DATE 2011/06/24 15:26

Business Day. A party's address may be changed by written notice to the other party; provided, however, that no notice of a change of address shall be effective until actual receipt of such notice. Copies of notices are for informational purposes only, and a failure to give or receive copies of any notice shall not be deemed a failure to give notice. Notices given by counsel to the Sponsor shall be deemed given by Sponsor, notices given by counsel to the Contributors shall be deemed given by Contributors, and notices given to a party's counsel shall be deemed given to the party. Notwithstanding the inclusion of a party's e-mail address in Paragraph 1.1, notices sent by e-mail shall not be effective notice. As used herein, "Business Day" shall mean any day other than a Saturday, Sunday or Kansas or federal holiday on which national banks in Overland Park, Kansas are customarily closed.

10.12    Construction. The parties acknowledge that the parties and their counsel have reviewed and revised this Agreement and that the normal rule of construction – to the effect that any ambiguities are to be resolved against the drafting party – shall not be employed in the interpretation of this Agreement or any exhibits or amendments hereto.

10.13    Calculation of Time Periods. Unless otherwise specified, in computing any period of time described herein, the day of the act or event after which the designated period of time begins to run is not to be included and the last day of the period so computed is to be included, unless such last day is a Saturday, Sunday or legal holiday for national banks in the location where the Property is located, in which event the period shall run until the end of the next day which is neither a Saturday, Sunday, or legal holiday. The last day of any period of time described herein shall be deemed to end at 5:00 p.m. local time where the Property is located unless otherwise noted. Any funds or documents delivered to Title Company or Escrow Agent shall only be delivered on a Business Day, and any funds or documents delivered after 2:00 p.m. local time where the Property is located shall be deemed delivered on the next Business Day.

10.14    Procedure for Indemnity. The following provisions govern actions for indemnity under this Agreement. Promptly after receipt by an indemnitee of notice of any claim, such indemnitee will, if a claim in respect thereof is to be made against the indemnitor, deliver to the indemnitor written notice thereof and the indemnitor shall have the right to participate in such proceeding and, if the indemnitor agrees in writing that it will be responsible for any costs, expenses, judgments, damages, and losses incurred by the indemnitee with respect to such claim, to assume the defense thereof, with counsel mutually satisfactory to the parties; provided, however, that an indemnitee shall have the right to retain its own counsel, with the fees and expenses to be paid by the indemnitor, if the indemnitee reasonably believes that representation of such indemnitee by the counsel retained by the indemnitor would be inappropriate due to actual or potential differing interests between such indemnitee and any other party represented by such counsel in such proceeding. The failure of indemnitee to deliver written notice to the indemnitor within a reasonable time after indemnitee receives notice of any such claim shall relieve such indemnitor of any liability to the indemnitee under this indemnity only if and to the extent that such failure is prejudicial to its ability to defend such action, and the omission so to deliver written notice to the indemnitor will not relieve it of any other liability that it may have to any indemnitee. If an indemnitee settles a claim without the prior written consent of the indemnitor, then the indemnitor shall be released from liability with respect to such claim unless the indemnitor has unreasonably withheld such consent.

10.15    Execution in Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of such counterparts shall constitute one Agreement. To facilitate execution of this Agreement, the parties may execute and exchange by telephone facsimile counterparts of the signature pages.

SCAN DATE 2011-06-24 15:26

10.16   Section 1031 Exchange. Either party may consummate the purchase or sale (as applicable) of the Property as part of a so-called like kind exchange (an "Exchange") pursuant to §1031 of the Internal Revenue Code of 1986, as amended (the "Code"), provided that: (a) the Closing shall not be delayed or affected by reason of the Exchange nor shall the consummation or accomplishment of an Exchange be a condition precedent or condition subsequent to the exchanging party's obligations under this Agreement; (b) the exchanging party shall effect its Exchange through an assignment of this Agreement, or its rights under this Agreement, to a qualified intermediary (c) neither party shall be required to take an assignment of the purchase agreement for the relinquished or replacement property or be required to acquire or hold title to any real property for purposes of consummating an Exchange desired by the other party; and (d) the exchanging party shall pay any additional costs that would not otherwise have been incurred by the non-exchanging party had the exchanging party not consummated the transaction through an Exchange. Neither party shall by this Agreement or acquiescence to an Exchange desired by the other party have its rights under this Agreement affected or diminished in any manner or be responsible for compliance with or be deemed to have warranted to the exchanging party that its Exchange in fact complies with §1031 of the Code.

10.17   WAIVER OF JURY TRIAL. TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE PARTIES HEREBY WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

10.18   Limitation of Liability. Sponsor acknowledges that the liability of Contributors shall be limited to its interests in the Property and the proceeds of sale, and shall not extend to any individual member, partner, officer, director, employee, agent, contractor or other person acting for or on behalf of Contributors. Further, as the interests of Contributors are held as tenants-in-common, the liability of each party composing Contributors hereunder shall be several (in accordance with each party's respective interest in the Property), and not joint.

10.19   Ratification by Selling Parties. The effectiveness of this Agreement is necessarily subject to and conditioned upon execution by all persons composing Contributors prior to April 15, 2011.

SCAN DATE 2011/06/24 15:25

SIGNATURE PAGE TO
CONTRIBUTION AGREEMENT

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day
and year written below.

CONTRIBUTORS:

Centennial Park Investors, LLC,
a Delaware limited liability company

By:    American Spectrum Asset Co., LLC
       a Delaware limited liability company

By: _____
       Paul Perkins, President

SCAN DATE 2011/05/24  15:26

SIGNATURE PAGE TO
CONTRIBUTION AGREEMENT

　　　IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day and year written below.

**CONTRIBUTORS:**

CENTENNIAL PARK TIC 1, LLC,
a Delaware limited liability company

By:　　The Davis Family Trust dated 8/28/1986, Member

　　　　　By: _Marlene Davis_
　　　　　　　Name: _Marlene Davis_
　　　　　　　Title: _Trustee_

SCAN DATE 2011/06/24 15:26

04/08/2011  11:59   9737287218          LAKELAND AUTO PARTS          PAGE  03/03

CENTENNIAL PARK TIC 2, LLC,
a Delaware limited liability company

By: _____
        Dean Moeller, Member

18

SCAN DATE 2011/06/24  15:26

CENTENNIAL PARK TIC 3, LLC,
a Delaware limited liability company

By:  _Nicholas A. Carson_
     Nicholas A. Carson, Member

19

SCAN DATE 2011/05/24 15:26

04/09/2011  15:04    6269142167              KARLTON&PHYLLIS MACK              PAGE  03/03

CENTENNIAL PARK TIC 4, LLC,
a Delaware limited liability company

By:      The Mack Family Trust dated 6/2/1989, Member

         By:      _____ TRUSTEE
                  Name:  KARLTON D. MACK
                  Title:  MEMBER

20

SCAN DATE 2011/05/24  15:26

Apr 08 11 04:58p     Ted and Maria Roslund                    1 530 644 7738          p.2

CENTENNIAL PARK TIC 5, LLC,
a Delaware limited liability company

By:     Ture and Maria Roslund Family Trust dated
        April 12, 1993, Member

        By:     _____     Maria Roslund
                Name: Ture Roslund   MARIA ROSLUND
                Title: Trustee

21

SCAN DATE 2011/08/24 15:20

CENTENNIAL PARK TIC 6, LLC,
a Delaware limited liability company

By: _____
Louis A. Roselli, Member

By: _____
Sally B. Roselli, Member

22

SCAN DATE 2011/06/24 15:28

CENTENNIAL PARK TIC 7, LLC,
a Delaware limited liability company

By: _Robert F. Spaulding_, member
       Robert F. Spaulding, Member

By: _Carol V. Spaulding_, member
       Carol V. Spaulding, Member

23

SCAN DATE 2011/06/24 15:26

CENTENNIAL PARK TIC 8, LLC,
a Delaware limited liability company

By:     The O'Hare Family Trust dated April 15, 1987, Member

By:     _Robert W. O'Hare_
        Name: _ROBERT W. O'HARE_
        Title: _TRUSTEE_

_Jean M. O'Hare_
JEAN M. O'HARE
TRUSTEE

24

SCAN DATE 2011/05/24 15:26

CENTENNIAL PARK TIC 9, LLC,
a Delaware limited liability company

By:      The Kent 1994 Family Trust dated March 23, 1994, Member

     By:    _Stephen Kent_
           Name: _STEPHEN F. KENT_
           Title: _Owner_

25

SCAN DATE 2011/06/24 15:26

CENTENNIAL PARK TIC 10, LLC,
a Delaware limited liability company

By:    Bonnie Jean Scaff Trust dated July 14, 2000, Member

      By:    _David M Scaff_
              Name: DAVID M SCAFE
              Title: TRUSTEE

26

SCAN DATE 2011/08/24 15:25

CENTENNIAL PARK TIC 11, LLC,
a Delaware limited liability company

By: _____
David L. Berg, Member

27

SCAN DATE 2011/05/24 15:26

APR-08-2011 09:45AM FROM-

T-233 P.004/004 F-883

CENTENNIAL PARK TIC 12, LLC,
a Delaware limited liability company

By:     The Gerber Family Trust dated December 5, 1994, as amended, Member

        By:     _____
                Beth S. Gerber, Member

28

SCAN DATE 2011/06/24 15:28

APR-08-2011  09:44AM  FROM-                                    T-289  P.002/004  F-983

CENTENNIAL PARK TIC 13, LLC,
a Delaware limited liability company

By:      Beth S. Gerber Trust dated December 5, 1994, Member

          By:    _____
                 Beth S. Gerber, Trustee

39

SCAN DATE 2011/06/24 15:26

CENTENNIAL PARK TIC 14, LLC,
a Delaware limited liability company

By:    The Gallaher Family Trust dated 5/30/1989, Member ,

      By:    _William H Gallaher  Mildred Kopelboin Tree_
           Name: _William H. Gallaher, Trea_
           Title: _member_

               Mildred K Gallaher, Trea
               member

30

CENTENNIAL PARK TIC 15, LLC,
a Delaware limited liability company

By:    The Lawrence L. Lonsinger and Mary C. Lonsinger
       Living Trust dated 11/20/1993, Member

       By:    _____
              Name: _Lawrence L Lonsinger_
              Title: _Owner / Trustee_

31

SCAN DATE 2011/06/24 15:26

CENTENNIAL PARK TIC 16, LLC,
a Delaware limited liability company

By:    The Rodich Trust dated 6/10/1992, Member

     By:    _____  Judith A. Rodich
            Name:   Elmore S. Rodich
            Title:   Trustees

32

SCAN DATE 2011/05/24 15:28

CENTENNIAL PARK TIC 17, LLC,
a Delaware limited liability company

By: _Karl M. Frisch_

Karl M. Frisch, Member

33

SCAN DATE 2011-06/24 15:25

CENTENNIAL PARK TIC 18, LLC,
a Delaware limited liability company

By:     Revocable Living Trust of Sugako Marumoto
        dated August 14, 1990, Member

        By:   _Sugako Marumoto_
              Name: SUGAKO MARUMOTO
              Title: MEMBER

34

SCAN DATE 2011/06/24 15:26

CENTENNIAL PARK TIC 19, LLC,
a Delaware limited liability company

By:   ~~Reynolds Investments, LP~~ *Credit Shelter Trust*

    By:   *of Harold D. Reynolds, The estate of* *Reynolds, Trustee*
              *dated 5th January, 2007*
         Name: *Theresa A. Reynolds*
         Title: *Trustee*

35

SCAN DATE 2011/06/24 15:26

CENTENNIAL PARK TIC 20, LLC,
a Delaware limited liability company

By:    MLake 77., LLC, its member

     By:

          Name: John Mivey
          Title: Manager

36

SCAN DATE 2011/03/24 15:26

CENTENNIAL PARK TIC 21, LLC,
a Delaware limited liability company

By:      The Sonntag Family Living Trust dated July 25, 1997, Member

     By:      _Walter M. Sonntag_

            Name: _WALTER M. SONNTAG_
            Title: _Diane R. Sonntag_

37

SCAN DATE 2011/06/24 15:26

CENTENNIAL PARK TIC 22, LLC,
a Delaware limited liability company

By: _____

Freddie Leon Horton, Member

38

CENTENNIAL PARK TIC 24, LLC,
a Delaware limited liability company

By:    Malzer Revocable Intervivos Trust dated July 22, 1991, Member

        By:    _____

                Name: _____   _Linda K Hall_

                Title: _____   _Co Trustee_

39

SCAN DATE 2011/05/24 15:26

SPONSOR:

Motus Properties, Dr.i a
Mississippi corporation

By: _____
Name: _Sacha W. Alvey_
Title: _Vice President_

"Sponsor"

Escrow Agent has executed this Agreement in order to confirm that the Escrow Agent has received and shall hold the Earnest Money and the interest earned thereon, in escrow, and shall disburse the Earnest Money, and the interest earned thereon, pursuant to the provisions of this Agreement.

ASSURED QUALITY TITLE COMPANY

By: _____
Date: _4-6-2011_         Name: _Don Rodgers_
Title: _Commercial Escrow Officer_

"Escrow Agent"

# EXHIBIT
## a

## TRANSITION AGREEMENT

This TRANSITION AGREEMENT (the "Agreement") is dated to be effective as of March ___, 2010, (the "Effective Date") by and among the tenant in common owners (the "Tenants in Common") of Centennial Park Apartments, located in Overland Park, Kansas (the "Project" or the "............." and American Spectrum Realty Management, LLC, a Delaware ................. ........ (the "Property Manager").

Property Manager has advised the Tenants in Common that Property Manager is currently managing the Property under an assignment or sub-management arrangement, pursuant to that certain Property Management Agreement dated as of February 3, 2004 (as amended, the "Property Management Agreement") between Centennial Park Acquisitions, LLC, a Delaware limited liability company, Centennial Park Investors, LLC, a Delaware limited liability company (the "Original Tenants in Common") and Evergreen Development, LLC (together with its affiliates, "Evergreen").

The Tenants in Common, as successors to the Original Tenants in Common, and Property Manager, as successor in interest to Evergreen, together desire to affirm the termination of the Property Management Agreement as hereinafter provided, and to provide for a smooth transition of asset and property management from Property Manager the new asset and property manager selected by the Tenants in Common, Maxus Properties, Inc., or an affiliated entity ("Maxus").

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.  **TERMINATION OF PROPERTY MANAGEMENT AGREEMENT; DELIVERIES BY PROPERTY MANAGER.**

    1.1     The parties hereby agree to the termination of the Property Management Agreement effective concurrently with or immediately preceding the closing of a new mortgage loan in the amount of approximately $10,000,000 or more (the "New Loan"), to be obtained by Maxus and the Tenants in Common for the purpose of satisfying and repaying its current mortgage loan (the "Termination Date"). Until the Termination Date, Property Manager agrees to diligently carry out and perform its duties pursuant to the Property Management Agreement, including operating and managing the Property, and assisting the Owners and Maxus in providing the information required to obtain the New Loan.

    1.2     Concurrently with the execution and delivery of this Agreement, Property Manager shall deliver to NorthMarq Capital, LLC, a letter in form and substance acceptable to NorthMarq, indicating that Property Manager's loan application is on behalf of Centennial Park is being assigned to and assumed by Maxus, upon repayment to Property Manager by Maxus or NorthMarq of the Third Party Expense Deposit, Freddie Mac Application Fee and Capital Application Fee previously paid by Property Manager or its affiliate in the amount of $40,250.

    1.3     From and after the Effective Date, and continuing until the Termination Date or the earlier termination of this Agreement, Property Manager shall permit Maxus reasonable access to the Property, its employees and all books and records, in order to permit Maxus to familiarize itself with the Property and its operation.

    1.4     Within ten (10) days following the Effective Date, Property Manager shall deliver to the Tenants in Common a Termination of Master Lease, in the form attached hereto as Exhibit A and otherwise in form and substance acceptable to the Tenants and Common and their title insurance

company, duly terminating that certain Master Lease dated February 24, 2004, between the Original Tenants in Common and Centennial Park Leasing Inc.

1.5    On or before the Termination Date, Property Manager shall deliver to Maxus (a) any balance or monies of the Tenants in Common or other funds held by Property Manager with respect to the Property, including tenant security deposits and any reserves, and (b) all materials and supplies, keys, books and records, contracts, leases, receipts for deposit, unpaid bills and other papers or documents and electronic records that pertain to the Property.

1.6    For a period of thirty (30) days following the Termination Date, Property Manager shall be available, through its executives and management personnel familiar with the Property, to consult with and advise the Tenants in Common and Maxus regarding the operation and maintenance of the Project.

1.7    Within thirty (30) days following the Termination Date, Property Manager shall deliver to Maxus and to each Tenant in Common based on their undivided interest in the Project a final accounting, setting forth the balance of income and expenses on the Project as of the Termination Date.

## 2.    PAYMENTS TO PROPERTY MANAGER.

2.1    On the Termination Date, Owner shall pay to Property Manager a fee of $76,875, as final payment of any management fee, financing fee, reimbursement or any other amounts due to Property Manager, Evergreen or any other person acting as "Property Manager" under the Property Management Agreement. No other payments will be made to Evergreen or Property Manager, with the exception of monthly management fees earned by Property Manager prior to the Termination Date.

## 3.    RELEASE AND INDEMNITY BY PROPERTY MANAGER.

3.1    Property Manager, on behalf of itself, its parent, principals, subsidiaries and other affiliates, and all of its and their respective shareholders, members, managers, officers, directors and employees, and their predecessors, successors and assigns (collectively, the "ASR Parties") hereby agree to release and discharge the Tenants in Common and their shareholders, members, managers, officers, directors and employees, and their successors and assigns (collectively, the "TIC Parties") from any and all claims, demands, causes of action, losses, damages, fines, penalties, liabilities, costs and expenses, including reasonable attorneys' fees and court costs (collectively, "Claims"), on account of any amounts due the ASR Parties or any of them under the Property Management Agreement.

3.2    Property Manager hereby agrees to indemnify, defend and hold the TIC Parties harmless from any and all Claims (i) arising out of or in connection with any amounts due to the ASR Parties or any of them (including, without limitation, Evergreen or any of its parent, principals, subsidiaries and other affiliates (the "Evergreen Parties")) under the Property Management Agreement, including without limitation any amounts claimed to be owed for funds advanced of approximately $700,000 and deferred management fees of approximately $50,000, or (ii) sustained or incurred by or asserted against the TIC Parties or any of them by reason of any act or omission of Property Manager or any other of the ASR Parties prior to the Termination Date in breach of the Property Management Agreement, or (iii) Property Manager's default in the performance of any of its obligations under this Agreement, including without limitation the breach of any representation or warranty of Property Manager contained in this Agreement. If any person or entity makes a claim or institutes a suit against one of the TIC Parties on a matter for which the Tenants in Common claim the benefit of the foregoing indemnification, then (a) the Tenants in Common shall give Property Manager prompt notice thereof in writing; (b) Property Manager may defend such claim or action by counsel of its own choosing provided such counsel is reasonably satisfactory to

SCAN DATE 2011/05/24  15:25

the Tenants in Common; and (c) neither the Tenants in Common nor Property Manager shall settle any claim without the other's written consent.

4.     **ACTIONS AS LLC MANAGER.**

4.1     The parties acknowledge that Property Manager or an affiliated entity has succeeded to the position of "Manager" of Centennial Park Acquisitions, LLC, one of the tenant in common co-owners of the Property ("Acquisitions"). Property Manager agrees that Manager (or any other affiliate of Property Manager that owns or controls Acquisitions or any other owner of a tenant in common interest in the Property) shall at all times vote it's interest and cause Acquisitions to vote its interest in the same manner and in accordance with the supermajority (60%) of all Tenants in Common, including the approval of any proposed property sale or any replacement asset or property manager, including Maxus, and will not exercise termination rights or any other rights contrary to supermajority.

5.     **REPRESENTATIONS AND WARRANTIES.**  As an inducement to the Tenants in Common to enter into this Transition Agreement, Property Manager hereby represents and warrants to the Tenants in Common and agrees as follows:

5.1     Property Manager is the acting "Property Manager" under the Property Management Agreement, and has succeeded to all right, title and interest of any and all Evergreen Parties thereunder.

5.2     Property Manager [or _____, which is an affiliate of Property Manager] is the acting "Manager" of Acquisitions, and has succeeded to all right, title and interest of any and all Evergreen Parties thereunder.

6.     **GOOD FAITH.**

The Property Manager and the Tenants in Common shall use their best efforts and act in good faith to cause all conditions to the effectiveness of this Agreement to be satisfied as soon as reasonably possible, including but not limited to cooperation with Lender to expedite approval of the New Loan and completing transition process.

7.     **MISCELLANEOUS.**

7.1     Assignment. Property Manager may not assign this Agreement without the prior written consent of each of the Tenants in Common, which consent may be withheld in the Tenants in Common's sole and absolute discretion.

7.2     Gender. Each gender shall include each other gender. The singular shall include the plural and vice-versa.

7.3     Amendments. Except as otherwise provided, each amendment, addition or deletion to this Agreement shall not be effective unless approved by the parties in writing.

7.4     Attorneys' Fees. In any action or proceeding between Property Manager and the Tenants in Common arising from or relating to this Agreement or the enforcement or interpretation hereof, the party prevailing in such action or proceeding shall be entitled to recover from the other party all of its reasonable attorneys' fees and other costs and expenses of the action or proceeding.

8.3     Amendments.   Except as otherwise provided, each amendment, addition or deletion to this Agreement shall not be effective unless approved by the parties in writing.

8.4     Attorneys' Fees.   In any action or proceeding between Property Manager and the Tenants in Common arising from or relating to this Agreement or the enforcement or interpretation hereof, the party prevailing in such action or proceeding shall be entitled to recover from the other party all of its reasonable attorneys' fees and other costs and expenses of the action or proceeding.

8.5     Severability.   If any provisions of this Agreement or application to any party or circumstances shall be determined by any court of competent jurisdiction to be invalid and unenforceable to any extent, the remainder of this Agreement, where the application of such provisions or circumstances other than those as to which it is determined to be invalid or unenforceable shall not be affected thereby, and each provision hereof shall be valid and shall be enforced to the fullest extent permitted by law.

8.6     No Waiver.   The failure by any party to insist upon the strict performance of, or to seek remedy of, any one of the terms or conditions of this Agreement or to exercise any right, remedy, or election set forth herein or permitted by law shall not constitute or be construed as a waiver or relinquishment for the future of such term, condition, right, remedy or election, but such item shall continue and remain in full force and effect.   All rights or remedies of the parties specified in this Agreement and all other rights or remedies that they may have at law, in equity or otherwise shall be distinct, separate and cumulative rights or remedies, and no one of them, whether exercised or not, shall be deemed to be in exclusion of any other right or remedy of the parties.

8.7     Counterparts.   This Agreement may be executed in several counterparts, executed shall constitute one Agreement, binding on all of the parties hereto, notwithstanding that all of the parties are not signatory to the original or the same counterpart.

IN WITNESS WHEREOF the parties hereby execute this Agreement to be effective as of the date set forth above.

PROPERTY MANAGER:

American Spectrum Realty Management II, LLC, a Delaware limited liability company

By: _Bill M. [signature]_
Name: _Bill McGrath_
Title: _Sr. VP of Operations_

SIGNATURE PAGE TO TRANSITION AGREEMENT

FOR

TENANTS IN COMMON

CENTENNIAL PARK APARTMENTS TIC __, LLC,
a Delaware limited liability company

By: _____
Name: _____PAUL PERKINS_____
Title: ___MANAGING MEMBER___

By: _____
Name: _____
Title: _____

SCAN DATE 2011/06/24 15:26

SIGNATURE PAGE TO TRANSITION AGREEMENT

FOR

TENANTS IN COMMON

CENTENNIAL PARK APARTMENTS TIC _1_, LLC,
a Delaware limited liability company

By: _Marlene Davis_
Name: _Marlene Davis_
Title: _Trustee, The Davis Family Trust dated 8/28/1986_

By: _____
Name: _____
Title: _____

SCAN DATE 2011/06/24 15:26

SIGNATURE PAGE TO TRANSITION AGREEMENT

FOR

TENANTS IN COMMON

CENTENNIAL PARK  APARTMENTS TIC 2, LLC,
a Delaware limited liability company

By: _____
Name: _____
Title: _____

By: _____
Name: _____
Title: _____

SCAN DATE 2011/06/24 15:26

SIGNATURE PAGE TO TRANSITION AGREEMENT

FOR

TENANTS IN COMMON

CENTENNIAL PARK APARTMENTS TIC 3, LLC,
a Delaware limited liability company

By: _Nicholas A. Carson_
Name: _NICHOLAS A. CARSON_
Title: _TIC 3_

By: _____
Name: _____
Title: _____

SCAN DATE 2011-06-24 15:26

SIGNATURE PAGE TO TRANSITION AGREEMENT

FOR

TENANTS IN COMMON

CENTENNIAL PARK APARTMENTS TIC 4, LLC,
a Delaware limited liability company

By: _Kantton S Mack_
Name: _KARLTON D. MACK_
Title: _MEMBER, TRUSTEE_

By: _____
Name: _____
Title: _____

SCAN DATE 2011/06/24 15:26

SIGNATURE PAGE TO TRANSITION AGREEMENT

FOR

TENANTS IN COMMON

CENTENNIAL PARK APARTMENTS TIC5, LLC,
a Delaware limited liability company

Ture & Maria Roslund Family Trust dated April 12 1993 Member

By: _____

Name: Ture P Roslund

Title: Trustee

By: _____

Name: MARIA ROSLUND

Title: TRUSTEE

SCAN DATE 2011/06/24 15:28

SIGNATURE PAGE TO TRANSITION AGREEMENT

FOR

TENANTS IN COMMON

CENTENNIAL PARK  APARTMENTS TIC _6_, LLC,
a Delaware limited liability company

By: _Lou N Roselli_
Name: _Louis A Roselli_
Title: _Owner_

By: _____
Name: _____
Title: _____

SCAN DATE 2011/06/24 15:26

SIGNATURE PAGE TO TRANSITION AGREEMENT

FOR

TENANTS IN COMMON

CENTENNIAL PARK APARTMENTS TIC 7, LLC,
a Delaware limited liability company

By: _Robert 7 Spaulding_
Name: Robert H. Spaulding
Title: owner

By: _Carol V. Spaulding_
Name: Carol V Spaulding
Title: owner

SCAN DATE 2011/06/24 15:26

SIGNATURE PAGE TO TRANSITION AGREEMENT

FOR

TENANTS IN COMMON

CENTENNIAL PARK  APARTMENTS TIC 8 , LLC,
a Delaware limited liability company

By: _Robert W. O'Hare_____
Name: _ROBERT  W. O'HARE_
Title: _TRUSTEE_____

By: _Jean M. O'Hare_____
Name: _Jean M. O'Hare_
Title: _Trustee_____

SCAN DATE 2011/06/24 15:25

SIGNATURE PAGE TO TRANSITION AGREEMENT

FOR

TENANTS IN COMMON

CENTENNIAL PARK APARTMENTS TIC **9**, LLC,
a Delaware limited liability company

By: _Stephen Kent_
Name: _STEPHEN F. KENT_
Title: _TRUSTEE_

By: _____
Name: _____
Title: _____

SCAN DATE 2011/06/24 15:26

SIGNATURE PAGE TO TRANSITION AGREEMENT

FOR

TENANTS IN COMMON

CENTENNIAL PARK  APARTMENTS TIC *10*, LLC,
a Delaware limited liability company

By: _David M Scott_
Name: _DAVID  M  SCOFF_
Title: _TRUSTOO_

By: _____
Name: _____
Title: _____

SIGNATURE PAGE TO TRANSITION AGREEMENT

FOR

TENANTS IN COMMON

CENTENNIAL PARK APARTMENTS TIC ]], LLC,
a Delaware limited liability company

By: _____
Name: _____DAVID BERG_____
Title: _____owner_____


By: _____
Name: _____
Title: _____

SCAN DATE 2011/06/24 15:27

SIGNATURE PAGE TO TRANSITION AGREEMENT

FOR

TENANTS IN COMMON

CENTENNIAL PARK  APARTMENTS TIC 12, LLC,
a Delaware limited liability company

By: _____
Name: BETH S GERBER
Title: _____


By: _____
Name: _____
Title: _____

SCAN DATE 2011/06/24 15:27

SIGNATURE PAGE TO TRANSITION AGREEMENT

FOR

TENANTS IN COMMON

CENTENNIAL PARK APARTMENTS TIC *13*LLC,
a Delaware limited liability company

By: _____

Name: *BETH LS GERBER*

Title: _____


By: _____

Name: _____

Title: _____

SCAN DATE 2011/06/24 15:27

SIGNATURE PAGE TO TRANSITION AGREEMENT

FOR

TENANTS IN COMMON

CENTENNIAL PARK  APARTMENTS TIC 14, LLC,
a Delaware limited liability company

By: Galluher Family Trust, dtd. 5/30/1989  member
Name: William H. Gallaher, Tree   William H Gallaher
Title: member

By: Galluher Family Trust, dtd. 5/30/1989   member
Name: Mildred K. Gallaher, Tree   Mildred K Gallaher, Tree
Title: member

SCAN DATE 2011/06/24 15:27

SIGNATURE PAGE TO TRANSITION AGREEMENT

FOR

TENANTS IN COMMON

CENTENNIAL PARK APARTMENTS TIC 15, LLC,
a Delaware limited liability company

By: _____
Name: Lawrence L Loasinger
Title: _____


By: _____
Name: _____
Title: _____

SCAN DATE 2011/06/24 15:27

SIGNATURE PAGE TO TRANSITION AGREEMENT

FOR

TENANTS IN COMMON

CENTENNIAL PARK APARTMENTS TIC 18 LLC,
a Delaware limited liability company

By: _____

Name: _____

Title: _____

By: _____

Name: Judith A Rodich

Title: Trustee

SCAN DATE 2011/06/24 15:27

SIGNATURE PAGE TO TRANSITION AGREEMENT

FOR

TENANTS IN COMMON

CENTENNIAL PARK  APARTMENTS TIC17, LLC,
a Delaware limited liability company

By: _____
Name: _____
Title: _____

By: _____
Name: _____
Title: _____

SCAN DATE 2011/05/24  15:27

SIGNATURE PAGE TO TRANSITION AGREEMENT

FOR

TENANTS IN COMMON

CENTENNIAL PARK  APARTMENTS TIC 18 LLC,
a Delaware limited liability company

By: _Sugako Marumoto_
Name: _SUGAKO   MARUMOTO_
Title: _member_

By: _____
Name: _____
Title: _____

SCAN DATE 2011/06/24 15:27

SIGNATURE PAGE TO TRANSITION AGREEMENT

FOR

TENANTS IN COMMON

CENTENNIAL PARK APARTMENTS TIC _19_, LLC,
a Delaware limited liability company

By: _Credit Shelter Trust of Harold D. Reynolds_   _Dated 5 January 2009_
                                        _Member_
Name: _Theresa G. Reynold_
Title: _Trustee_


By: _____
Name: _____
Title: _____

SCAN DATE 2011/06/24 15:27

SIGNATURE PAGE TO TRANSITION AGREEMENT

FOR

TENANTS IN COMMON

CENTENNIAL PARK  APARTMENTS TIC 20, LLC,
a Delaware limited liability company

By:   MLake 77, LLC, its member
    By: _____
    Name: _____
    Title: _____


    By: _____
    Name: _____
    Title: _____

SCAN DATE 2011/06/24 15:27

SIGNATURE PAGE TO TRANSITION AGREEMENT

FOR

TENANTS IN COMMON

CENTENNIAL PARK APARTMENTS TIC 21, LLC,
a Delaware limited liability company

By: _____
Name: _____
Title: _____

By: _____
Name: _____
Title: _____

SIGNATURE PAGE TO TRANSITION AGREEMENT

FOR

TENANTS IN COMMON

CENTENNIAL PARK  APARTMENTS TIC 23 LLC,
a Delaware limited liability company

By: _Freddie Leon Horton_
Name: _Freddie Leon Horton_
Title: _Member_


By: _____
Name: _____
Title: _____

SCAN DATE 2011/06/24  15:27

SIGNATURE PAGE TO TRANSITION AGREEMENT

FOR

TENANTS IN COMMON

CENTENNIAL PARK APARTMENTS TIC 24 LLC,
a Delaware limited liability company

By: _____
Name: _Linda K. Nall_
Title: _Trustee_

By: _____
Name: _Karen M. Salter_
Title: _Trustee_

SCAN DATE 2011/06/24 15:27